NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180771-U

NO. 4-18-0771

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 10, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| DANNY KUEHNER, | ) | No. 05CF724 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Ryan M. Cadagin, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices DeArmond and Holder White concurred in the judgment.

**ORDER**

¶ 1  *Held:*   The appellate court affirmed the trial court's second-stage dismissal of defendant's postconviction petition.

¶ 2  In October 2005, defendant, Danny Kuehner, entered an open plea of guilty to attempt (first degree murder) (720 ILCS 5/8-4, 9-1(a)(1) (West 2004)) and home invasion (*id.* § 12-11(a)(2)). In February 2007, the court sentenced defendant to a total of 35 years in prison. This court affirmed defendant's conviction and sentence on direct appeal. *People v. Kuehner*, No. 4-07-0426 (2008) (unpublished order under Illinois Supreme Court Rule 23).

¶ 3  In May 2009, defendant *pro se* filed a petition for postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008)). After advancing the petition to the second stage, the trial court granted appointed counsel's motion to withdraw and the State's motion to dismiss. This court affirmed on appeal. *People v. Kuehner*,

2014 IL App (4th) 120901, ¶ 95, 8 N.E.3d 1148. The Illinois Supreme Court reversed, holding that counsel's motion to withdraw was inadequate because it failed to address each of defendant's *pro se* claims. *People v. Kuehner*, 2015 IL 117695, ¶ 27, 32 N.E.3d 655.

¶ 4		On remand, in May 2018, defendant filed an amended petition for postconviction relief, asserting that plea counsel misrepresented the strength of the State's evidence to "convince" defendant to plead guilty. The amended petition alleged defendant had a defense to attempt (first degree murder) because the medical records showed that the injuries to the victim were relatively minor and no specific intent to kill existed. As a corollary, defendant claimed sentencing counsel was ineffective for failing to challenge the State's showing of severe bodily harm, a finding that was necessary to make defendant's sentences mandatorily consecutive.

¶ 5		The State filed a motion to dismiss, claiming defendant failed to demonstrate counsel's performance was deficient or that defendant suffered prejudice. In September 2018, the trial court conducted a hearing on the State's motion and dismissed the amended petition.

¶ 6		Defendant appeals, arguing (1) the trial court erred by dismissing his amended postconviction petition because it made a substantial showing of a constitutional violation that (a) plea counsel was ineffective for lying about the strength of the State's case and (b) sentencing counsel failed to present evidence in mitigation that the victim did not suffer great bodily harm or severe bodily injury; and (2) postconviction counsel provided unreasonable assistance in violation of Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013) because he failed to (a) make clear the petition was presenting a claim that defendant's plea was based on a mistake of fact and (b) include a claim of prosecutorial misconduct. We disagree and affirm.

¶ 7		I. BACKGROUND

¶ 8		A. The Initial Charges

¶ 9    In June 2005, the State charged defendant by information with (1) attempt (first degree murder) (720 ILCS 5/8-4, 9-1(a)(1) (West 2004)), (2) home invasion (*id.* § 12-11(a)(2)), (3) residential burglary (*id.* § 19-3(a)), (4) robbery of a senior citizen (*id.* § 18-1(a)), (5) aggravated battery of a senior citizen (*id.* § 12-4.6(a)), and (6) criminal damage to property (*id.* § 21-1(1)(a)). The charges alleged that defendant, or someone for whom he was legally responsible, broke into the home of Margaret Geldrich and beat her, breaking bones and dislocating her shoulder, and stole jewelry from her residence. In July 2005, the State filed a motion to add counts, alleging the same crimes but including that defendant was extended-term eligible pursuant to sections 5-5-3.2(b)(4)(ii) and 5-5-3.2(b)(2) of the Unified Code of Corrections because Geldrich was over 60 years old at the time of the offense and the offense was accompanied by exceptionally brutal or heinous behavior. 730 ILCS 5/5-5-3.2(b)(2), (b)(4)(ii) (West 2004).

¶ 10                B. The Guilty Plea Hearing

¶ 11    In October 2005, the trial court conducted a change of plea hearing. The court first granted the State's motion to add counts (characterizing it as a motion to amend). The State explained that defendant was willing to plead guilty to attempt (first degree murder) and home invasion as amended and was eligible for a sentence of 6 to 60 years in prison on each count, mandatory consecutive, to be served at 85%. The State also noted that defendant was charged with "simple armed robbery" in a separate case that would be dismissed as part of the plea.

¶ 12    The trial court admonished defendant about the potential sentences for the offenses, emphasizing that, in effect, defendant would receive between 12 and 120 years in prison. The court explained that defendant was entering an "open plea," and there were no guarantees as to the particular sentence he would receive. Defendant stated he understood.

Defendant also stated that (1) he was satisfied with his counsel's performance; (2) no one had threatened, bullied, or promised anything to him in exchange for his guilty plea; and (3) he was pleading guilty "of [his] own free will, because it's what [he] want[s] to do."

¶ 13          As a factual basis for the plea, the State informed the trial court that on the morning of June 3, 2005, a relative of the victim found the 98-year-old Geldrich "in a pool of blood, unconscious." The State continued as follows:

"A police investigation began at that time. Mrs. Geldarich [*sic*] was taken to the hospital. She had extensive injuries. She had fractures on both sides of her face, she had a fracture on her arm, dislocation of her shoulder, and a substantial amount of bleeding from her head and her face. There was even blood spattered on the stove from where her face had been stomped while she was on the ground.

She was treated for a significant period of time, was eventually able to regain consciousness and was eventually interviewed."

¶ 14          The State then explained that police arrested defendant and Bruce Lloyd in connection with an attempted armed robbery of a cab driver. The police found jewelry belonging to Geldrich. The police interviewed Lloyd and defendant and determined that another person, a minor named C.H., was involved in the break-in at Geldrich's residence as well. C.H. told the police that (1) the three boys planned and participated in a residential burglary of Geldrich because she was old, hard of hearing, and could barely see; (2) C.H. saw defendant help Lloyd break a window and the two went into the house; (3) C.H. ran home (which was just next door) and 35 minutes later, defendant came to his house saying that Lloyd was in the house and Geldrich was screaming. The State concluded by stating as follows:

"Mr. Lloyd claims that Mr. Kuehner was actually the beater. [C.H.] and

Mr. Kuehner both deny that and both claimed that Mr. Lloyd was the individual who attacked Mrs. Geldarich[*sic*][.] [H]owever, under the common design rule and the accountability rule, the actual identity of the particular beater is not important for purposes of the plea, at least for the guilt/innocence phase.

When Mr. Lloyd was interviewed, he indicated that before leaving the home, he checked Mrs. Geldarich [*sic*] to see if she was still alive, to see if she was breathing.

The victim also stated there were two people inside of the home. She said that she had to lay unconscious and essentially pretend to be dead in order to make the beating stop."

¶ 15 Defense counsel stipulated that the State's evidence would be substantially as the State described. The trial court accepted defendant's guilty plea, dismissed the remaining counts against him, and continued the case for sentencing.

¶ 16                                  C. Posttrial Proceedings

¶ 17 After pleading guilty, the parties agreed to continue defendant's sentencing hearing to give defendant a chance to testify against his co-defendants. In November 2006, at what was supposed to be a sentencing hearing, defense counsel explained to the trial court that defendant had written a letter complaining about his representation and therefore counsel moved to withdraw from the case. Defendant told the court that counsel had pressured him to plead guilty. The court granted counsel's motion to withdraw. Eventually, defendant hired private counsel to represent him in post-plea proceedings.

¶ 18 In February 2007, defendant, through post-plea counsel, filed a motion to withdraw his guilty plea, alleging it was not knowing and voluntary because plea counsel, John

Sharp, (1) told defendant if he did not accept the plea, the offer would be given to co-defendant Lloyd, (2) told defendant he would receive between 12 and 20 years if he pled guilty, and (3) did not investigate defendant's mental condition at the time of the plea or the crime.

¶ 19                    1. *The Hearing on the Motion To Withdraw Guilty Plea*

¶ 20            Later in February 2007, the trial court conducted a hearing on defendant's motion to withdraw. Defendant testified that Sharp told him he would receive 12 to 20 years if he pleaded guilty and would receive a much longer sentence if he went to trial. Defendant stated that he met with Sharp between 5 and 10 times before he sought new counsel and Sharp never inquired about defendant's psychiatric condition, even though defendant told him he was released from a psychiatric hospital the same day he was arrested.

¶ 21            On cross-examination, defendant conceded he knew that the possible sentencing range was between 12 and 120 years and that no one had ever promised him a specific number. Defendant acknowledged he pleaded guilty with the hope that if he cooperated with the State against his co-defendants, he would receive a lesser sentence. Defendant further acknowledged that he did, in fact, testify against C.H., and, at that trial, he admitted under oath that he had not been promised anything in exchange for his plea or testimony. Defendant also admitted that he understood right from wrong at the time of the offense and had the ability to control his actions. Defendant agreed that he testified extensively and in detail at C.H.'s trial and admitted that he agreed to participate in the robbery.

¶ 22                    a. Defendant's Testimony at C.H.'s Trial

¶ 23            The State offered a copy of defendant's trial testimony into evidence without objection from defendant. In that testimony, defendant explained that he was 17 at the time of the offense and that he had pleaded guilty to attempt (first degree murder) and home invasion based

on an accountability theory. Defendant maintained that he did not personally cause any of the injuries to Geldrich.

¶ 24       Defendant testified that on the night of the robbery, he, C.H., and Lloyd, spent most of the evening drinking liquor and smoking marijuana, traveling between various friends' houses. The group discussed finding someone to beat up, breaking into cars, and stealing things. At one point, while the group was traveling, defendant broke into a car, but the owner of the car came out of his house and chased the group away.

¶ 25       Defendant testified that they then started walking to C.H.'s house. On the way, defendant and C.H. mentioned that a friend of theirs claimed to have stolen jewelry from a deaf and blind woman who lived two houses down the street from C.H. The friend claimed to have taken things while the woman was present without her knowing. The three then discussed breaking into this woman's home and taking electronics and jewelry. The plan was for Lloyd to break into the house and unlock the door for defendant, while C.H. would be the lookout.

¶ 26       Once they got to the house, C.H. stood on the side of the house while defendant and Lloyd went into the backyard. Defendant stated that Lloyd broke into a window and was halfway into the house when defendant heard screaming. Defendant immediately ran to C.H.'s house where he found C.H., and the two waited there for a few minutes before leaving. The two wondered if Lloyd had hurt the woman, so they decided to go back to her house.

¶ 27       Defendant testified that as they approached the front door, Lloyd came out and mentioned that he pushed the woman and she was hurt. Defendant went inside to see what happened and check on her. Defendant was "[r]eally shocked" by what he saw: the woman was lying motionless on the floor. Defendant went up to her, put his hand under his shirt (ostensibly to prevent leaving forensic evidence behind), and touched her side to see if she was breathing.

Defendant testified, "She looked bad. I mean, she didn't—I didn't remember seeing no blood or anything. I don't remember, but she couldn't move. She wasn't getting up. She wouldn't get up, though, so it looked bad." Defendant left and asked Lloyd what had happened. Lloyd said he pushed her down because she was screaming. Defendant testified that "I knew that she was alive right there because she was yelling and stuff, but I thought that she might, yeah, she might possibly die if she kept laying there."

¶ 28        Defendant testified that the three of them began walking to someone's house where they thought they could get money or drugs for the jewelry Lloyd had taken. Defendant stated he asked Lloyd questions such as, "[W]hat if something bad happens? What if she dies, or what if she comes close to it or if she's real hurt? He said he didn't care, that he'd killed people before. It didn't matter." Defendant testified that Lloyd threatened to kill him and C.H. if they told the police.

¶ 29                          b. Plea Counsel's Testimony

¶ 30        Defendant then called his plea counsel, John Sharp, to testify. Sharp denied "instruct[ing]" defendant to plead guilty and said, "I advised [defendant] as to what the various options were, what the evidence was." Sharp further stated that defendant "entered a plea of guilty following our discussions of what was contained in the police reports and following a discussion of what the evidence was that would be presented against him in a courtroom." Sharp acknowledged that he knew defendant had been in a psychiatric ward and that he was taking medication for depression.

¶ 31        On cross-examination, Sharp stated he had been practicing criminal law since 1987, was familiar with the legal definitions of sanity and fitness, and that defendant never had any difficulty understanding what was going on around him or in his case. Sharp said he met

with defendant several times and they "went through the evidence as I was receiving documentation from the State's Attorney's Office." Sharp stated he explained to defendant that he was legally accountable for his co-defendants' conduct. Defendant did not like that fact but understood the concept. The following exchange occurred:

"Q. Ever do anything to coerce him or force him into pleading guilty?

A. No I did not.

Q. Did you give him your best professional advice?

A. Yes I did.

Q. Tell us what advice you gave him.

A. When I spoke with Danny after accumulating all the police reports and after going through the evidence that the State had, I informed Danny he was facing 12 to a hundred twenty years in prison. I informed Danny that given the fact he had no prior adult crimes in his record, given the fact that he was willing to cooperate, I informed Danny that it was my best contention to try to get him between 12 to 20 years. *** At no time did I tell Danny Kuehner that I would guarantee him 12 to 20 years. Danny knew that going in.

Q. So he also understood that was the best case scenario of what you were hoping to accomplish by cooperating?

A. Yes. I informed Danny with his two co-defendant's [*sic*] this was a horrible, horrible crime. It was something that was rather widely reported on. I had told Danny that with respect to his two co-defendants, if Danny wanted to be in a position to attempt to have mitigating factors to talk about, that Danny might want to consider cooperating because in cooperating, he would be able to have

acceptance of responsibility. He would be able to do something to try to make up for what had happened that night. He would be able to testify truthfully and could testify against both co-defendants if the State was willing to have him cooperate; and that's when I approached you about the prospect of Danny's cooperation.

Q. Ever guarantee the end result if he would cooperate?

A. No, but what I did tell him was the minimum he could hope to get was 12 years, and given the fact he had no priors that I was hopeful we could get him to no more than 20; and that was as far as I could go because I could not speak for the Court and didn't know what the recommendation would be from the State's Attorney's Office.

Q. You had this conversation with him after assessing the strengths and weaknesses of the case?

A. Yes.

Q. And would you say the factual case against this [d]efendant was very strong?

A. I wouldn't say it was very strong. I would say it was overwhelming.

Q. The [d]efendant was caught with the other co-defendants, is that true?

A. Yes.

Q. He was caught with proceeds of the crime in their possession?

A. Yes.

Q. He contacted the police and solicited them to come to his jail cell where he made incriminating statements?

A. Yes, he did.

Q. And each of the other participants in the crime identified him as being involved, is that correct?

A. Yes, they did.

Q. Did you see in your professional judgment that the best case you could do was to attempt damage control?

A. That was the only thing that could be done for Mr. Kuehner.

Q. Did you discuss that strategy with him prior to his plea?

A. Yes.

Q. Did he understand that the prospects for him going to trial were rather grim?

A. Yes, he did.

Q. And is this a decision that he made or is this a decision that was forced upon him?

A. It was a decision he made."

¶ 32    Defendant argued he received ineffective assistance of plea counsel because Sharp did not inform him of the potential mitigating impact of defendant's mental illness. The State argued that Sharp's actions were entirely proper and that defendant could not have suffered prejudice because he was clearly fit. The trial court denied the motion to withdraw, stating "[t]here is nothing in the record, nothing that would indicate the plea was not entered into knowingly, voluntarily, without coercion. Certainly based on the *Strickland* case and *Strickland* standards, Mr. Sharp's representation *** was exemplary." The court further noted that, to the extent defendant wished to argue his mental illness was mitigating, he was free to do so at the sentencing hearing.

¶ 33                              2. *The Sentencing Hearing*

¶ 34          The trial court conducted defendant's sentencing hearing immediately after it

denied the motion to withdraw guilty plea.

¶ 35                              a. Evidence in Aggravation

¶ 36          The State called Detective Ryan Sims, who testified that he investigated the

robbery and beating of Geldrich. Sims testified that he saw Geldrich at the hospital and she "had

extensive swelling, bleeding and bruising on her face. She was conscious. *** She had extensive

swelling and couldn't open her eyes at the time ***." Sims stated that hospital staff informed

him that she had a facial fracture, a dislocated shoulder, and a broken arm in addition to the

swelling and bruising. The State then introduced photos of Geldrich taken at the hospital and at

her home, which showed the severity of the injuries. In one photo, Geldrich is laying on the floor

of the kitchen in front of a stove with blood on the floor.

¶ 37          Sims testified that defendant, through his girlfriend, indicated he wanted to speak

with the police about the incident. Sims interviewed defendant, and defendant made statements

to Sims that were substantially similar to defendant's testimony at C.H.'s trial. Defendant also

told Sims that defendant had gone into Geldrich's house and approached her to check if she was

alive, given the severity of the injuries. Defendant told Sims he thought Geldrich may have died.

¶ 38          On cross-examination, Sims acknowledged that defendant and C.H. denied

involvement in the beating, that C.H. did not see who went in the house, and that defendant

appeared at C.H.'s house a short time after C.H. did. Sims stated that a forensic analysis of

defendant's clothing did not reveal any of the victim's blood was present. Sims further stated that

he spoke with defendant several times after the arrest and leading up to C.H.'s trial. Although

defendant tried to minimize his role in the robbery, Sims agreed that defendant's story was

largely consistent and added more detail as time went on.

¶ 39    Stephanie Coonrod testified that she was Geldrich's second cousin and legal guardian at the time of the robbery. Coonrod was her guardian because Geldrich was 98 years old and legally deaf and blind. Geldrich had difficulty seeing and hearing but was able to cook, clean, and perform yard work. Coonrod stated that Geldrich was five feet tall and weighed 98 pounds.

¶ 40    Coonrod testified that she arrived at 7 a.m. at Geldrich's house and heard Geldrich yelling for help. Coonrod saw her lying on the floor with "a pool of blood by her nose ***. She was all black and blue. Her face was swelled. She looked awful." Coonrod stated, "I figured she was going to die right there."

¶ 41    Coonrod testified that she accompanied Geldrich to the hospital, where Coonrod learned that Geldrich "had a lot of fractures throughout her face. Her shoulder was dislocated. She had fractures in her arm and *** she was black on blue on the left side, all down the left side where it looked like she had been kicked when she was down." Coonrod reported that Geldrich told her that two or three boys came through her bathroom window and beat her. Geldrich thought they were going to kill her, so she played dead to make them stop. Coonrod stated that Geldrich was at the hospital for four days and then went to a nursing home for two weeks.

¶ 42    Coonrod testified that Geldrich was able to go home but she was afraid. Geldrich was no longer able to cook for herself because her eyesight was significantly worse. Geldrich died about a year after the robbery. When asked what life was like for Geldrich, Coonrod stated as follows: "Well, she just wanted to die. That's what she said most of the time. She said, I wish I could just die. She just gave up on life ***." Coonrod continued that Geldrich "was always a very independent lady, never married, always lived alone *** and then every day you would go

over and she would just beg to die because she wasn't able to function like she had before. And, plus, her feet—I guess they must have stomped on her feet because she complained they hurt, hurt all the time. Her shoulder hurt her, and, like I say, her eye sight had gotten a lot worse."

¶ 43　　　　On cross-examination, Coonrod agreed "it would be possible" that Geldrich was mistaken about the number of people in her house because she was legally deaf and blind.

¶ 44　　　　　　　　　　b. Evidence in Mitigation

¶ 45　　　　Defendant's aunt and mother testified on his behalf in mitigation. They emphasized defendant's prior mental illness, drug addiction, young age, and that he did not have any role in the actual beating. Defendant also offered his mental health records from his hospital stay immediately prior to the robbery. Defendant's counsel noted that the records reported depression, suicidal and homicidal thoughts, and drug addiction.

¶ 46　　　　In allocution, defendant stated that he was very sorry for what happened and that he wished he could "go back to that night and stop [Lloyd] from going to her home because she did not deserve what happened to her." Defendant further stated, "I am very sorry and I did not want anything like this to happen to anyone. I just cannot accept responsibility for her being hurt because I did not know she was going to be hurt. I did not hurt her and would never hurt anyone like this. I never said I was innocent of all this, but I don't believe I'm guilty of Attempted Murder or any of the charges involved with Miss Geldrich getting hurt." Defendant reiterated his mental health problems and that he had accepted responsibility by contacting the police and cooperating.

¶ 47　　　　c. The Great Bodily Injury and Severe Bodily Harm Findings

¶ 48　　　　The State first addressed whether there was great bodily harm in conjunction with the home invasion such that any sentence would have to be served at 85%. The State argued that

- 14 -

the testimony indicated there were "multiple facial fractures, [a] fracture to Ms. Geldrich's arm, [and a] dislocated shoulder. She had extensive hospitalization, rehabilitation. Those photographs before you speak for themselves." Defendant objected to a finding of great bodily harm on the grounds that there was no evidence that defendant participated in the beating. The trial court stated, "That is not a legal basis for me to consider," and found that there was great bodily harm.

¶ 49 The State then sought a finding of severe bodily injury to require that the sentences be served consecutively. The State relied on "the same reasons and enumerated injuries." Defendant did not object, and the trial court found there was severe bodily injury.

¶ 50 d. The State's Argument

¶ 51 When asked for a sentencing recommendation, the State acknowledged that the trial court had a very large sentencing range and therefore the relative culpability of defendant was important. The State noted that "[w]e went into a lot more detail in [Lloyd's] sentencing hearing." The State believed that Lloyd "was the primary aggressor" and the most culpable, but based on the evidence contained, in part, in the transcript it had submitted, defendant was legally responsible for Geldrich's severe injuries.

¶ 52 Regarding the injuries, the State said, "Those photographs are some of the most graphic I have seen in prosecuting cases. And this is an extremely vulnerable woman, harmed very, very severely and suffered very, very substantial injuries." The State further emphasized that defendant and his co-defendants specifically targeted Geldrich because she was elderly and disabled and "[i]n a lot of ways this is the most outrageous part of the case." "This poor woman lived for 330 days hoping and wanting to die to escape the condition that these defendants put her in. It's an unspeakable crime, a horrific crime, and one that cries out for a substantial sentence." The State also pointed out that although defendant claimed he wished he could go

back and change what happened, his testimony demonstrated that he was in a position to help but chose to do nothing. The State concluded by stating that "but for the pleas of guilty I would absolutely be standing before you asking for a sentence of imprisonment to assure this [d]efendant dies in prison."

¶ 53                                    e. Defendant's Argument

¶ 54        Defense counsel agreed that the crime was "monstrous," "shocking to the senses, shocking to society," and the only question was the degree of culpability. Counsel emphasized defendant's role in getting Lloyd to plead guilty and testifying against C.H. Defendant went to the police unprompted to cooperate. He had prior problems with drug addiction and mental illness. Defendant was young at the time of the offense and was also intoxicated. The crime was spontaneous and there was no intent to hurt anyone beforehand. Counsel also reiterated that there was no physical evidence or testimony tying defendant to the beating.

¶ 55                                    f. The Trial Court's Ruling

¶ 56        The trial court first noted that it had "heard no competent evidence that this [d]efendant threw a punch, threw a kick or in any way personally injured the victim ***. And it's clear also that this [d]efendant is less involved than Bruce Lloyd." However, the court also noted that legally, defendant was just as culpable as if he performed the beating himself. Still, the court stated it would be giving defendant a lesser sentence than the 50 years it had given Lloyd. "He was involved apparently in the planning of this, in the commission of the crime and significantly after the victim was beaten and left for dead, he gladly and willfully participated in reaping the fruits of the crime. It didn't appear there was any remorse at that time."

¶ 57        The trial court agreed that mitigating factors were present in that (1) defendant cooperated early on and testified against C.H. and (2) defendant had mental health and drug

- 16 -

abuse problems. The court noted, however, that this case was "unusual" in that "[o]rdinarily I can give somebody credit for accepting responsibility when they plead guilty, but the [d]efendant, I believe, stated today he did not accept responsibility directly." The court continued that "given what he told me, I can't give him the usual reward for accepting responsibility as I would somebody else because he did tell me he didn't, still didn't think he is guilty even as he sits here today."

¶ 58        Regarding aggravating factors, the trial court noted that the actions caused serious harm that was (1) not an element of attempt (first degree murder) and (2) was over and above the threshold necessary to prove home invasion. The court also stated defendant's history of delinquency and failure to take previous chances for rehabilitation constituted an aggravating factor. The court summarized its thoughts about the crime as follows:

> "So this is a very heinous crime, very shocking crime, one of the more shocking crimes we have seen in this area for some time. The victim's age is obvious. The fact that the victim was physically handicapped is obvious. This [d]efendant and his cohorts really can on that night for reasons known only to them objectively be viewed as having been barbarians. They were predators. They preyed on this poor old lady, picked her out, beat her almost to death for no reason. She had done nothing to them. This crime does shock the consciousness."

¶ 59        Ultimately, the trial court sentenced defendant to 17½ years on each count, for a total of 35 years in prison. The court explained that the sentence was a 40% reduction from Lloyd's sentence, which accounted for defendant's (1) cooperation and (2) his relative culpability in that he did not personally inflict the injuries. The court further commented that the sentence was very much on the low end of the 12- to 120-year permissible range, and the

aggravating factors required a sentence in excess of the minimum.

¶ 60                                    D. The Direct Appeal

¶ 61          On direct appeal, defendant argued only that the trial court abused its discretion

by giving him a 35-year sentence. Defendant claimed the sentence was excessive given (1) his

low level of participation, (2) his young age, and (3) his potential for rehabilitation. This court

affirmed defendant's sentence, noting that the record demonstrated that the trial court expressly

considered these factors and chose a sentence on the low end of the sentencing range. *People v.*

*Kuehner*, No. 4-07-0426 (2008) (unpublished order under Illinois Supreme Court Rule 23).

¶ 62                                  E.  The Postconviction Petition

¶ 63          In May 2009, defendant *pro se* filed a petition for postconviction relief, alleging,

among other claims, that Sharp was ineffective for providing false and misleading information to

defendant and his family in order to get him to plead guilty. The trial court advanced the petition

to the second stage and appointed counsel. The State filed a motion to dismiss, and counsel filed

a motion to withdraw. The trial court granted both motions, and this court affirmed on appeal.

*People v. Kuehner*, 2014 IL App (4th) 120901, ¶ 95, 8 N.E.3d 1148.

¶ 64          The Illinois Supreme Court reversed, holding that counsel's motion to withdraw

was inadequate because it failed to address each of defendant's *pro se* claims. *People v. Kuehner*,

2015 IL 117695, ¶ 27, 32 N.E.3d 655. The supreme court noted that the allegations about

Sharp's alleged lies to defendant were "specific, substantial, and sufficiently present in the

petition to warrant appointed counsel's attention." *Id.* ¶ 23. The court stated that the defendant's

allegations that "trial counsel manipulated defendant's aunt and mother into convincing

defendant to plead guilty, both by concealing exculpatory police and medical reports and by

falsely guaranteeing a sentence of between 12 and 20 years in prison," if true, "raise serious

concerns about trial counsel's conduct." *Id.* The court made clear that it expressed no opinion regarding whether the claims had merit, but that counsel's failure to explain why they lacked merit required reversal for further proceedings. *Id.*

¶ 65                                    F.  Proceedings on Remand

¶ 66        Consistent with the supreme court's opinion, the trial court appointed new counsel on remand. In May 2018, postconviction counsel filed a lengthy amended petition for postconviction relief, supported by affidavits, medical records, and transcripts of police interviews. The thrust of the amended petition was that Sharp withheld exculpatory evidence from defendant and his family and affirmatively misrepresented the strength of the State's case to get defendant to plead guilty. (We note that the amended petition did *not* allege that Sharp made any promises of a particular sentence or that Sharp told defendant he needed to plead guilty because they could not afford to pay him to take the case to trial.)

¶ 67        In his affidavit, defendant made the following assertions. In September 2005, Sharp met with defendant to tell him the State was offering a blind plea. Sharp told him that the evidence against him was "overwhelming" in that "(1) Geldrich had been beaten into a coma, (2) she had multiple fac[ial] fractures, a broken arm, and los[t] a great deal of blood from her head and face, (3) that [C.H.] had informed the police that he saw [defendant] enter Geldrich's house, (4) that Geldrich told police there were two attackers in her house, and (5) that the police found blood on [defendant's] t-shirt, which 'probably' belonged to Geldrich." Defendant rejected the plea deal and asked to see the evidence against him, but Sharp refused.

¶ 68        In October 2005, Sharp came to attempt to get defendant to plead guilty again, saying he was confident defendant would get no more than 20 years. Defendant refused to plead guilty and again asked to see the evidence, which Sharp again declined to show him. Five days

later, defendant was woken up by Sharp, telling him the plea hearing was moved up. Defendant refused to plead guilty. Sharp left and came back shortly thereafter with the prosecutor, who began pressuring defendant to plead. In addition to repeating the misrepresentations Sharp had made earlier, the prosecutor allegedly told defendant (1) Geldrich could not be interviewed because she "was beaten into a coma that lasted 9-10 days," (2) Geldrich's head had been "stomped" into the floor, resulting in blood splatter "all over the stove," and (3) that the case was "one of the worst Attempted Murders" he had ever seen. The prosecutor stated that if defendant turned down the deal, the State would offer it to Lloyd, who would say that defendant did the beating. Sharp then told defendant (1) this was an attempted murder because the victim was beaten so badly, (2) defendant was accountable for Lloyd's actions, (3) the evidence was "overwhelming," and (4) Sharp could "save" most of defendant's life if he took the plea. At that point defendant agreed to plead guilty.

¶ 69    Defendant went on to claim that he only saw the medical records evidence after he was sentenced in February 2007.

¶ 70    In his amended petition, defendant argued that each of the representations made to him, as stated in his affidavit, was false. To support this contention, defendant attached certain medical records from Geldrich's hospitalization that show she had (1) a less than one-centimeter fracture in her nose (not multiple), (2) a Hills-Sachs fracture (a chipping of the top of the arm bone that often occurs during a dislocation, as opposed to a broken arm), and (3) no lacerations on her face or head. The records also show that Geldrich was conscious the entire time, other than her normal sleep, and she lost between 100 and 500 millimeters of blood.

¶ 71    Defendant also attached portions of the transcript of a police interview of C.H., which showed that C.H. said he never saw defendant enter the house. Defendant also attached a

copy of a police interview with Geldrich in which she only said there might have been two attackers after the police suggested there were multiple attackers. The remainder of the time she used singular pronouns and stated she only saw one person. Further, the forensic testing showed Geldrich's blood was not on defendant's shirt, and, even if it was, defendant was charged under an accountability theory, so the presence of blood was irrelevant. However, counsel made the fact that the victim's blood was probably present seem like a crucial piece of evidence against defendant.

¶ 72    Defendant also claimed that his counsel did not let him review the medical records, which showed that Geldrich's injuries were relatively minor for a 98-year-old woman and could have been the result of Lloyd's merely repeatedly pushing her to the ground. Defendant claimed that if Sharp had informed him of this information and that it was sufficient to challenge the specific intent to kill necessary to prove attempt (first degree murder), he would have gone to trial. This conclusion was evident, given that defendant repeatedly refused to plead guilty after counsel's presentation of the State's case, and gave in only after (1) he spoke with the prosecutor, (2) his counsel told him he could receive 12 to 20 years if he pleaded guilty, (3) his counsel told him that if he didn't want to spend the rest of his life in prison he needed to plead, and (4) his counsel told him that the State was going to offer the deal to Lloyd to testify that defendant was the aggressor if he did not plead guilty right away.

¶ 73    Defendant attached portions of Lloyd's interviews with police, in which Lloyd says that he did not intend for Geldrich to get hurt and asserts defendant is the one who hurt her. Lloyd stated he checked to see if Geldrich was breathing because he wanted to see if she was still alive and because "it's not like I went in to try to kill the lady or anything." Defendant also attached Lloyd's allocution from sentencing at which Lloyd said he "didn't think that when [he]

let [defendant] in he was going to hurt Mrs. Geldrich." Defendant argued (1) these statements showed that Lloyd did not have the intent to kill Geldrich and (2) the defense was clearly plausible because C.H. was acquitted of attempt (first degree murder) in his juvenile case.

¶ 74            Defendant next claimed Sharp was ineffective for stipulating to a factual basis from the State that included the above described misrepresentations and a few others, such as that C.H. said defendant appeared at his house 35 minutes after the break in, instead of the 5 minutes C.H. actually said in his interview.

¶ 75            Defendant also contended that sentencing counsel was ineffective for failing to challenge the findings of great bodily harm and severe bodily injury by presenting the medical evidence that demonstrated the relatively minor nature of Geldrich's injuries.

¶ 76            The State filed a motion to dismiss, arguing that (1) Sharp did not give a deficient performance and (2) even assuming he did, defendant was not prejudiced. The State pointed to various places in the record that supported the statements made by Sharp and the State at the plea hearing. The State argued that any differences or misstatements were minor and were not a factor. Regarding the coma, the State asserted that Geldrich's treating physician testified at C.H.'s trial and stated that Geldrich acted like someone who had lost consciousness or who had a concussion. (We note that a transcript of this testimony appears in the record.)

¶ 77            In September 2018, the trial court conducted a hearing on the State's motion to dismiss. After considering extensive argument from the parties, the court ruled that defendant had failed to make a substantial showing of ineffective assistance under *Strickland* and granted the motion to dismiss.

¶ 78            This appeal followed.

¶ 79                                        II.  ANALYSIS

¶ 80    Defendant appeals, arguing (1) the trial court erred by dismissing his amended postconviction petition because it made a substantial showing of a constitutional violation that (a) plea counsel was ineffective for lying about the strength of the State's case and (b) sentencing counsel failed to present evidence in mitigation that the victim did not suffer great bodily harm or severe bodily injury; and (2) postconviction counsel provided unreasonable assistance in violation of Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013) because he failed to (a) make clear the petition was presenting a claim that defendant's plea was based on a mistake of fact and (b) include an argument of prosecutorial misconduct. We disagree and affirm.

¶ 81                     A. Ineffective Assistance of Plea Counsel

¶ 82    Defendant's arguments largely mirror those he made in his amended postconviction petition. Defendant sets forth in detail (1) the alleged misrepresentations and (2) how the medical records and transcripts attached to the petition demonstrate their falsity. Defendant argues his guilty plea was not knowing and voluntary because Sharp misrepresented the strength of the State's case against him and refused to show him medical records that could have provided a defense to attempt (first degree murder). Specifically, defendant contends that the medical records show that Lloyd did not have the specific intent to kill Geldrich because the injuries were minor compared to what one would expect for a 98-year-old.

¶ 83    The State responds that defendant's arguments fail on two grounds. First, defendant cannot demonstrate deficient performance because the State's description of the evidence at the change of plea hearing, ostensibly containing the most factual misrepresentations, was in fact supported by the evidence. Second, even assuming the statements were in fact misrepresentations, they were minor differences that did not prejudice defendant because he did not have a defense at trial.

¶ 84 We agree with the State and conclude that the record demonstrates that Sharp neither gave a deficient performance nor prejudiced defendant.

¶ 85 1. *The Applicable Law*

¶ 86 a. Proceedings Pursuant to the Post-Conviction Hearing Act

¶ 87 The Act provides a criminal defendant the means to redress substantial violations of his constitutional rights that occurred in his original trial or sentencing. *People v. Crenshaw*, 2015 IL App (4th) 131035, ¶ 23, 38 N.E.3d 1256; 725 ILCS 5/122-1 (West 2008). The Act contains a three-stage procedure for relief. *People v. Allen*, 2015 IL 113135, ¶ 21, 32 N.E.3d 615; 725 ILCS 5/122-2.1 (West 2008). At the second stage, the trial court appoints counsel who must then investigate defendant's claims and make any amendments necessary for an adequate presentation of defendant's contentions. Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013). The State may file a motion to dismiss the petition, and the petition advances to a third-stage evidentiary hearing only if defendant makes a "substantial showing of a constitutional violation." (Internal quotation marks omitted.) *People v. Johnson*, 2018 IL App (5th) 140486, ¶ 22, 99 N.E.3d 1.

¶ 88 The Illinois Supreme Court has described proceedings at the second stage as follows:

"The second stage of postconviction review tests the legal sufficiency of the petition. Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or 'show' a constitutional violation. In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle

petitioner to relief." (Emphasis in original.) *People v. Domagala*, 2013 IL 113688, ¶ 35, 987 N.E.2d 767. The appellate court reviews a trial court's dismissal of a petition at the second stage *de novo*. *People v. Sanders*, 2016 IL 118123, ¶ 31, 47 N.E.3d 237.

¶ 89                                b. Ineffective Assistance of Plea Counsel

¶ 90        To establish a claim of ineffective assistance of guilty-plea counsel, the defendant must show that counsel's performance (1) fell below an objective standard of reasonableness and (2) was prejudicial. *People v. Brown*, 2017 IL 121681, ¶ 25, 102 N.E.3d 205. A defendant's failure to satisfy either prong negates a claim of ineffective assistance of counsel. *People v. Fellers*, 2016 IL App (4th) 140486, ¶ 23, 77 N.E.3d 994; see also *People v. Palmer*, 162 Ill. 2d 465, 475, 643 N.E.2d 797, 801 (1994) (holding the same with respect to guilty pleas).

¶ 91        "[A] defendant may attack the *knowingness* or *intelligence* of the guilty plea by showing that the advice defense counsel gave, and upon which the defendant relied in pleading guilty, was not within the range of competence demanded of attorneys in criminal cases." (Emphasis in original.) *People v. Watkins*, 2019 IL App (4th) 180605, ¶ 30. To establish prejudice, a defendant " 'must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.' " *Brown*, 2017 IL 121681, ¶ 26 (quoting *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985)). When the ineffective assistance claim relates to a defendant's prospects at trial, the Illinois Supreme Court has required "a claim of innocence or a plausible defense to establish prejudice." *Id.* ¶ 45 (citing *People v. Hall*, 217 Ill. 2d 324, 336-37, 841 N.E.2d 913, 920 (2005)). When the claim relates to advice concerning the consequences of a plea, a petitioner "must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." (Internal

quotation marks omitted.) *Id.* ¶ 40.

¶ 92    Even in the context of guilty pleas, "counsel's strategic decisions are virtually unchallengeable. [Citation.] Further, the fact that another attorney might have pursued a different strategy is not a factor in the competency determination." *Palmer*, 162 Ill. 2d at 476. When assessing counsel's performance, a reviewing court is required "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (Internal quotation marks omitted.) *People v. Ramirez*, 2018 IL App (1st) 152125, ¶ 16, 127 N.E.3d 146.

¶ 93                              c. Attempt (First Degree Murder)

¶ 94    The First District has summarized the standard to prove attempt (first degree murder) as follows:

> "To sustain a conviction for attempted murder, the State must establish beyond a reasonable doubt: (1) defendant performed an act constituting a substantial step toward the commission of murder, and (2) defendant possessed the criminal intent to kill the victim. [Citation.] Because attempted murder is a specific intent offense, it must be proven defendant had the specific intent to kill. [Citation.] However, because the specific intent to take a life is a state of mind, it is rarely proven through direct evidence. [Citation.] The specific intent to kill may be inferred from the circumstances, such as the character of the assault on the victim and the use of a deadly weapon." (Internal quotation marks omitted.) *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52, 69 N.E.3d 446.

¶ 95    Other factors include (1) the nature and extent of the victim's injuries (*People v. Teague*, 2013 IL App (1st) 110349, ¶ 24, 986 N.E.2d 149), (2) actions taken after the assault to

help or not help the victim (*People v. Parker*, 311 Ill. App. 3d 80, 90-91, 724 N.E.2d 203, 211 (1999)), and (3) disparity in the size and strength of the defendant and the victim (*People v. Scott*, 271 Ill. App. 3d 307, 311, 648 N.E.2d 86, 88 (1994)). Finally, the "[i]ntent to kill may be inferred where one voluntarily commits an act, the natural tendency of which is to destroy another's life." *People v. Smado*, 322 Ill. App. 3d 329, 339, 750 N.E.2d 233, 242 (2001).

¶ 96                                    2. *This Case*

¶ 97        First, defendant's affidavit was, in fact, contradicted by the record. Sharp testified at the hearing on the motion to withdraw that he met with defendant and went over the evidence and police reports with him. Sharp also went over the strengths and weaknesses of the case and what the State's evidence would be. It was only after this process that defendant decided to plead guilty. (We note the trial court found Sharp's performance was "exemplary.")

¶ 98        Second, the record demonstrates that the State had testimony to support almost all the assertions made in the factual basis and alleged in defendant's affidavits. At sentencing, Coonrod testified that (1) Geldrich had multiple facial fractures, (2) it appeared Geldrich had been kicked on the ground, (3) Geldrich said in the hospital that two or three boys broke in and beat her, and (4) Coonrod believed the attackers "stomped" on Geldrich's feet because Geldrich complained about her feet being in so much pain. Coonrod also said she found Geldrich with a pool of blood by her nose. The pictures show a lot of blood on the floor near the stove. The medical records indicate Geldrich lost between 100 and 500 milliliters of blood. Geldrich was also in the hospital for four days and spent two more weeks recovering in a nursing home.

¶ 99        Based on all of the above, the State's factual basis is at most an exaggerated version of evidence that is currently in the record. However, the factual basis is not a substitute for proof at trial. See *In re C.K.G.*, 292 Ill. App. 3d 370, 685 N.E.2d 1032 (1997) (explaining that

the State is not required to present all or even most of its evidence at the plea hearing and any disagreements a defendant has with the representations merely demonstrate there may be conflicting evidence). The State certainly could have had even more evidence or different statements it could have relied on. Any remaining discrepancies are so minor that they could not have impacted defendant's decision to plead guilty.

¶ 100        The statements that lack support are that (1) Geldrich was in a coma and (2) C.H. told police that he saw defendant enter the house before the attack. Although the limited pages of the transcript attached to the amended petition do not include any statements from C.H. that he saw defendant in the house, Lloyd did maintain that he let defendant in and even that defendant did the beating. The State, in giving its factual basis, said the identity of the attacker was not relevant. Sharp testified that he told defendant the same thing. Defendant in his affidavit said that Sharp told him he was responsible for Lloyd's actions. All of these statements are true—all three of the boys admitted to the police that they agreed to perform a residential burglary of Geldrich's house. They were all legally accountable for each other's actions during the commission of the offense. Whether C.H. told police defendant was or was not in the house before the attack is irrelevant to whether defendant was guilty or whether he should plead guilty.

¶ 101        We found no evidence in the record that would support a statement that Geldrich was in a "coma." However, the treating physician testified at C.H.'s trial that Geldrich exhibited symptoms of a person who had been unconscious or suffered a concussion. Sharp's alleged description of putting Geldrich in a coma certainly could have been mere hyperbole, an attempt to demonstrate the way the State would portray the beating at trial. Sharp certainly did not commit any error by giving defendant a description of the worst-case scenario of what would be presented against defendant at trial. Sharp was so adamant about the "grim prospects" of

defendant at trial that when asked if he thought the State had a "very strong case," he replied, "No, I wouldn't say the State had a very strong case. *I would say the State's case was overwhelming*." (Emphasis added.) Sharp did nothing more than present his honest and experienced opinion about the evidence defendant would be facing at trial.

¶ 102     Additionally, we note that the State had ample evidence to support the charge of attempt (first degree murder). Geldrich told the police that the attacker beat her repeatedly, including with what she thought was a piece of the broken window frame. She was hit in the stomach, shoulder, head, and face. Geldrich maintained that she "knew [she] couldn't fight him. He was too husky." Geldrich stated, "I never hollered and he never hollered neither. *I wanted him to think that I was dead,* so he wouldn't hit me no more, *but he still kept battering*." (Emphases added.) Geldrich stated her whole body hurt, she could not get up, and she thought she may die. Geldrich's plan to play dead apparently worked in the sense that both defendant and Lloyd stated they physically touched her to determine she was still alive. Defendant testified that (1) he told C.H. that he was worried that she could have died and that was why they went back to the house, (2) he spoke repeatedly with Lloyd about whether Geldrich was alive or dead, and (3) Lloyd told defendant he did not care if Geldrich died because he had killed people before and he would kill C.H. or defendant if they went to the police. (Although defendant would obviously not be compelled to testify at his own trial, these statements were made to Lloyd and C.H. or otherwise in their presence, and there is no reason to think they would not be admissible.)

¶ 103     Based on the above, the State had testimony to present that (1) there was a size disparity between the attacker and the victim, (2) the attacker used a piece of the window frame as a weapon, (3) the attacker continued to beat the victim after she was playing dead on the floor, (4) Lloyd and defendant did, in fact, believe Geldrich was dead before they checked to see if she

was breathing, and (5) Lloyd expressed that he had killed in the past and was prepared to kill his accomplices if they talked. A trier of fact easily could have concluded that Lloyd had the specific intent to kill Geldrich on these facts. (Although Geldrich's injuries were not as severe as what might be expected from someone trying to beat an old woman to death, a person who attacks a frail 98-year-old would likewise expect that death could be accomplished with far less effort. Accordingly, it is significant that Geldrich said she was battered after playing dead, Lloyd believed she was dead, and Lloyd did not care if she died and did not want anyone to call for help.)

¶ 104    As a result, Sharp believed that pleading guilty and cooperation were necessary if defendant did not want to spend the rest of his life in prison. The state's attorney said at sentencing that "but for the pleas of guilty I would absolutely be standing before you asking for a sentence of imprisonment *to assure this [d]efendant dies in prison*." (Emphasis added.) As if that was not enough, Lloyd maintained in his allocution at his sentencing that defendant was the one who battered Geldrich. If the State was indeed considering offering Lloyd a plea deal in exchange for his testimony against defendant, defendant faced a situation even more dire. Lloyd received 50 years in prison, despite the trial court's noting that it was still unclear what went on inside the house and the fact that Lloyd was just a year older than defendant. Further, defendant had several other Class 1 felonies pending against him that were (1) extended-term eligible and (2) subject to consecutive sentences. Sharp testified that "the only thing that could be done for [defendant]" was "to attempt damage control" in the form of cooperation. By pleading to the two worst crimes—likely the only offer the State was willing to make—defendant got the State to dismiss all remaining counts, which is far from a meaningless concession.

¶ 105    In short, when viewed through the lens of what was known to all the parties

- 30 -

involved at the time, Sharp's advice was entirely appropriate, and defendant's choice to plead guilty was eminently reasonable. Defendant had already admitted to the police he participated in the planning and execution of the home invasion. The only question he was facing was whether he should risk going to trial against a prosecutor who was dead set on ensuring he died in prison and had extremely strong evidence to make that happen, or if he should plead guilty soon enough to cooperate and likely get a sentence that would let him live a meaningful amount of time out of prison.

¶ 106 Defendant makes much of the fact that C.H. went to trial on the attempt (first degree murder) charge, presented medical evidence demonstrating the severity of the injuries, and was found guilty of only aggravated battery of an elderly person and not guilty of attempt (first degree murder). But the mere fact that one defendant took a chance and succeeded at trial does not mean counsel for a co-defendant was ineffective for not taking the same approach. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). The calculation for defendant was almost certainly dramatically different than that for C.H., who was being tried as a juvenile. In any event, Sharp's advice falls well within the acceptable range for criminal defense attorneys. See, *e.g.*, *Palmer*, 162 Ill. 2d at 482 (the fact that defense counsel's strategy of having defendant "throw himself on the mercy of the court" by entering an open plea of guilty to murder was unsuccessful did not mean counsel was ineffective or that defendant's plea was involuntary).

¶ 107 Because counsel was not ineffective and defendant was not prejudiced, post-plea counsel and appellate counsel were not ineffective for failing to raise the arguments (1) at the motion to withdraw guilty plea hearing or (2) on direct appeal.

¶ 108                    B. Ineffective Assistance of Sentencing Counsel

¶ 109          Defendant also contends that sentencing counsel was ineffective for failing to

challenge the State's evidence of great bodily harm and severe bodily injury. Defendant argues

that the medical records demonstrate that the injuries were not nearly as severe as Coonrod and

Sims made them out to be and that the State's description of the injury in its factual basis for the

plea, which the trial court relied upon at sentencing, was incorrect. Defendant claims the failure

to present this evidence was objectively unreasonable and prejudiced defendant because the

findings required (1) the court to impose consecutive sentences and (2) defendant to serve his

sentences at 85%.

¶ 110                              1. *The Applicable Law*

¶ 111          The Unified Code of Corrections provides that a trial court shall impose

consecutive sentences if "one of the offenses for which [the] defendant was convicted was first

degree murder or a Class X felony or Class 1 felony and the defendant inflicted serious bodily

injury[.]" 730 ILCS 5/5-8-4(a)(i) (West 2006). "Generally, prisoners are entitled to day-for-day

good-conduct credit against their sentences." *People v. Lopez-Bonilla*, 2011 IL App (2d) 100688,

¶ 11, 962 N.E.2d 1100 (citing 730 ILCS 5/3-6-3(a)(2.1) (West 2006)). However, a defendant is

required to serve 85% of his or her sentence if convicted of home invasion with a finding of great

bodily injury. *Id.* (citing 730 ILCS 5/3-6-3(a)(2)(iii) (West 2006)).

¶ 112          "Although the term great bodily harm is not susceptible of a precise legal

definition, it requires an injury of a greater or more serious character than an ordinary battery."

(Internal quotation marks omitted.) *Id.* ¶ 13. This court has held that "[n]o meaningful difference

exists between the terms 'great bodily harm' and 'severe bodily injury.' " *People v. Daniels*,

2016 IL App (4th) 140131, ¶ 102, 58 N.E.3d 902. "Bodily harm as it relates to ordinary battery

requires some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent." (Internal quotation marks omitted.) *Id.* "Great bodily harm does not require hospitalization of the victim, or permanent disability or disfigurement, but instead centers on the injuries that the victim received." *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 13.

¶ 113 This court has also held that a "comparative approach" can be problematic because the trial court has wide discretion to determine whether great bodily harm exists, and a finding either way can be "reasonably defensible." *People v. Witherspoon*, 379 Ill. App. 3d 298, 310, 883 N.E.2d 725, 735 (2008). In *Witherspoon*, we deferred to the trial court's finding of severe bodily injury where there was evidence of "bruising of [the victim's] legs, ankle, and upper arm," photographs showed the injuries "were extremely painful," and "[t]he doctor saw the need to take X-rays." *Id.*

¶ 114                                    2. *This Case*

¶ 115 We conclude defendant was not prejudiced by counsel's decision to forgo challenging the State's evidence of great bodily harm and severe bodily injury. It is difficult to see how counsel could have realistically challenged either of these factors. Geldrich suffered (1) a dislocated shoulder, (2) a Hills-Sachs fracture on her arm, (3) a broken nose, and (4) eyes bruised so badly that they were swollen shut. Geldrich told the police she was unable to get up off the floor, lying there for six hours before Coonrod found her, and she thought she could die. Coonrod testified that Geldrich had (1) even worse eyesight, such that she could no longer take care of herself, (2) constant pain in her shoulder, and (3) spent the last year of her life complaining about her pain and "begg[ing] to die."

¶ 116 Defendant points out that the fracture on her face was less than one centimeter

and a Hills-Sachs fracture is the chipping of the bone associated with a dislocation. Certainly, the phrases "facial fracture" and "broken arm" are more jarring than language used by defendant, but they are nonetheless entirely accurate descriptors. The State, post-plea counsel, and the trial court all described the conduct as "shocking" and "heinous," and we agree. The pictures in the record, submitted to the trial court at sentencing, vividly document the brutality of what was an unimaginable nightmare for Geldrich.

¶ 117 Defendant also rightly notes that the State painted a graphic picture of the injuries such that counsel had little to lose by challenging the severity of the injuries. However, as the State pointed out at sentencing, the parties went into much more detail in Lloyd's sentencing. From this we can surmise that defense counsel got a preview of what a more detailed hearing would result in. Even ignoring that fact, Sharp explained the trial strategy he gave to defendant was to accept responsibility. Sentencing counsel's strategy was clearly to highlight defendant's mental health and drug addiction. The trial court found that these were the most compelling factors in mitigation. The court also said that it *would have* given defendant more credit for acceptance of responsibility but for defendant's allocution that he could not admit to being guilty for the beating. In short, it appears that both counsels' strategies worked and would have worked even more but for defendant's insistence that he could not be held responsible for Lloyd's actions. Challenging the severity of the injuries risked (1) having the trial court focus more on the injuries rather than on defendant's mitigating factors and (2) undermining defendant's remorse and acceptance of responsibility. We conclude sentencing counsel's performance was not deficient and did not prejudice defendant.

¶ 118 C. Ineffective Assistance of Postconviction Counsel

¶ 119 Defendant next argues that postconviction counsel was ineffective for two

reasons. First, defendant claims postconviction counsel should have "made explicitly clear" that he was presenting a claim that defendant's guilty plea was involuntary because it was made under a mistake of fact, namely, the seriousness of Geldrich's injuries. However, the State's case was indeed based on the severity of the beating Geldrich received, and we earlier concluded that the evidence the State could have presented at trial was more than sufficient to support a conviction for attempt (first degree murder). Ultimately, this claim fails for the same reasons as defendant's ineffective assistance of plea counsel claim—even assuming defendant was misinformed, that misapprehension did not rise to a level that affected the knowing or voluntariness of defendant's plea. Thus, postconviction counsel did not act unreasonably by failing to raise this separate claim.

¶ 120       Second, defendant claims postconviction counsel should have set forth a claim that the State committed prosecutorial misconduct when it misrepresented the facts of the case. However, based on our earlier discussion of the State's factual basis (see *supra* ¶¶ 97-102), we conclude that the State's actions were not misconduct. Instead, the State was at most painting a picture of the worst-case scenario for defendant based on testimony it believed it could present at the time. The record demonstrates that the State could have presented such testimony based on what others stated at the sentencing hearing. Any differences in the testimony were minor and not sufficient to render defendant's plea involuntary.

¶ 121                             III. CONCLUSION

¶ 122       For the reasons stated, we affirm the trial court's dismissal of defendant's amended postconviction petition at second-stage proceedings.

¶ 123       Affirmed.