No. 3--99--0450

_________________________________________________________________

 IN THE

 APPELLATE COURT OF ILLINOIS

 THIRD DISTRICT

 A.D., 2001 

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court

OF ILLINOIS, ) of the 12th Judicial Circuit, 

 ) Will County, Illinois

Plaintiff-Appellee, ) 

 )

v. ) No. 97--CF--4852

 ) 

SCOTT A. SMADO, ) Honorable

                                ) Stephen White

Defendant-Appellant. ) Judge, Presiding

_________________________________________________________________

PRESIDING JUSTICE HOMER delivered the opinion of the court:

_________________________________________________________________

Following a jury trial, the defendant, Scott Smado, was convicted of attempted first degree murder (720 ILCS 5/8--4(a), 9--1(a)(1) (West 1996))
.  He was sentenced to 44 years of imprisonment.  On appeal, the defendant argues (1) that his trial attorneys were ineffective by (a) failing to call alibi witnesses, (b) withdrawing the defendant’s motion to suppress identification evidence, and (c) failing to object that chain of custody was not established for the State’s DNA evidence; (2) that the court erred in limiting cross-examination of the victim about her former relationship with a police officer; and (3) that the State failed to prove the elements of attempted first degree murder beyond a reasonable doubt.  We affirm.

BACKGROUND

On September 14, 1997, the victim, Sandra Novak, arrived at a bar in South Chicago Heights at about 7 p.m. and met her friend, Guido.  Novak drank beer and shots of blackberry brandy before she and Guido left the bar to go to a restaurant for dinner.  Novak had some more drinks with dinner.  After she and Guido returned to the bar, she continued to drink beer and shots of blackberry brandy.  Novak estimated that there were about six people in the bar.  Guido left after about 40 minutes.

At some point after Novak returned to the bar from dinner, the defendant entered the bar.  She had not met the defendant before that evening.  Novak recalled that he had tattoos on his neck and both arms.  During a conversation between the defendant and Novak that lasted about an hour, Novak asked him about his tattoos.  After he said that he did his own tattoos, Novak asked him if he would give her a tattoo of a mole above her lip.  Novak and the defendant decided to go to the defendant’s house so that he could give Novak the tattoo.  By this time, the four people who remained in the bar were Novak, the defendant, the bartender, and the bartender’s boyfriend.

Novak and the defendant left in what Novak assumed at the time was the defendant’s car.  She remembered that it was a small, light-colored, two-door car with bucket seats and that the interior of the car was "kind of messy."  On direct examination, she identified a photograph of the defendant’s wife’s car as the car that the defendant was driving.

After they were driving for a while, Novak became nervous because the area in which they were traveling was dark and hilly.  She thought it seemed unlikely that they were going to the defendant’s house.  She asked to get out of the car and said that she could find her way home.  The defendant just kept driving.  When she asked again to get out of the car, the defendant punched her in the nose.  Her nose then bled profusely.

The defendant pulled the car over in the parking lot of a plant nursery.  After Novak got out of the car and said that she just wanted to leave, the defendant hit her over the head several times.  She remembered asking him to stop, but he kept hitting her over the head.  She testified that he hit her with something more than with his fist.

After the defendant left, Novak knocked on the doors of the nursery’s greenhouse, but no one was there.  She made her way to a farmhouse where she asked for help.  The next thing she remembered, she was in the hospital.  As a result of this beating, Novak suffered a broken nose, a crushed right cheekbone, a torn left ear, a fractured hand, and a chipped tooth.  She had diminished sight out of her left eye, and the doctors placed a metal plate in the left side of her head.

At the hospital, blood was drawn from Novak at 2:47 a.m. on September 15, 1997.  Novak’s blood-alcohol level was .277. 

On September 16, 1997, Officer Patrick Barry of the Will County sheriff’s police met with Novak in the intensive care unit of the hospital.  Barry initially testified that Novak was unable to talk because she was on a breathing apparatus.  Barry later testified that Novak was not on the breathing apparatus, but could "speak very little."  Novak and Barry communicated mostly by handwritten notes.  Novak indicated to Barry that her attacker was known as "Tattoo Tony."  At trial, Novak testified that the defendant had identified himself at the bar as "Tattoo Tony."

Barry testified that from descriptions of the attacker’s tattoos, the Chicago Heights police department gave him the defendant’s name as a possible suspect.  Barry spoke with an investigator from South Chicago Heights who said that he and another patrol officer had picked up the defendant’s wife between 10 and 11 p.m. on the night of Novak’s attack.  The defendant’s wife was walking home on a dark street after playing bingo.  She told the officers that her husband was supposed to pick her up but had not.

At the September 16 meeting between Barry and Novak in the hospital, Barry showed Novak a lineup of five or six photos of individuals with similar characteristics.  The defendant’s photo was included in this lineup.  On this day, Novak was unable to positively identify the defendant’s photograph.

On September 17, 1997, Barry returned to the hospital and showed Novak a second photo lineup.  The defendant was the only person whose photos were common to both lineups.  On this occasion, Novak identified the defendant’s photo as being that of her assailant.  She signed the back of the defendant’s photo from this second photo lineup.

At the trial, defense counsel began to ask Novak about her previous relationship with a South Chicago Heights police officer.  The prosecutor objected on the grounds of relevance.  Out of the presence of the jury, defense counsel submitted that the defense was investigating the possibility that Novak previously had been beaten by the police officer whom she had dated.  The defendant’s attorney also offered that an investigating officer’s report noted that he overheard a doctor at the hospital say that Novak was attempting to protect the identity of her assailant.  The judge stated that he would sustain the prosecution’s objection unless the defense could tie this beating to her previous relationship with the police officer.  In open court, Novak testified that she never told anyone that she was trying to protect the identity of her assailant.

Law enforcement officers gathered evidence from the area around the nursery and the defendant’s wife’s car.  Novak’s earrings and sandals were recovered from the crime scene.  Among other items, police technicians and officers retrieved an eight-inch crescent wrench from the defendant’s wife’s car.  Police officers testified that the crescent wrench, however, was not conclusively tied to Novak’s beating.

A police evidence technician removed pieces of the car’s passenger door panel and packaged them for the crime lab.  A crime lab technician testified that one bloodstain from the door panel was a mixed stain that contained Novak’s DNA profile and the DNA of another person.  A second bloodstain was unmixed and was consistent with Novak’s DNA.

At trial, Charles Fehil testified that he and the defendant were incarcerated at the Will County jail during the same time period.  Fehil said the defendant told him that the defendant’s case would likely be dropped if two witnesses were not found by the State.  At the trial, the prosecution submitted evidence that the bartender and the bartender’s boyfriend from the bar where Novak and the defendant met were subpoenaed as witnesses, but could not be located at the time of trial.

The defendant confided in Fehil that on the night of the beating, he had left a bar in Chicago Heights with someone with whom he wanted to have sex.  The defendant told Fehil that he got angry with this person and punched her while stopped in a car in front of a greenhouse.  The person either got out or fell out of the car and the defendant started beating the person.  The defendant told Fehil that he gave this person a "pumpkin head," a prison term meaning beating someone about the head producing bumps all over the person’s head.  The defendant kicked her in the head and because she did not move, he thought she was dead.  Fehil testified that the defendant said he wanted to kill this person.  Fehil said that he was offered a reduced sentence by the State in exchange for his testimony.

The jury found the defendant guilty of attempted first degree murder (720 ILCS 5/8--4(a), 9--1(a)(1) (West 1996)), and aggravated battery (720 ILCS 5/12--4(a) (West 1996); 720 ILCS 5/12--4(a) (West Supp. 1997)).  
Initially, the court sentenced the defendant to consecutive sentences of 44 and 10 years for these offenses.  After the defendant moved to reconsider the sentence, the court found that the aggravated battery count merged with the attempted first degree murder count and sentenced the defendant to 44 years of imprisonment.

ANALYSIS

 I. Whether the Defendant’s Trial Attorneys Were Ineffective

The right of the accused to counsel in preparation for trial is a fundamental constitutional right guaranteed by the sixth and fourteenth amendments of the Constitution of the United States, and article I, section 8, of the Illinois Constitution.  U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §8.  This right includes the right to effective assistance of counsel. 
 To prevail on a claim of ineffective assistance of counsel, a defendant must establish that (1) trial counsel’s performance fell below an objective standard of reasonableness, and (2) that counsel’s deficient performance so prejudiced the defendant that but for counsel’s errors the outcome of the trial likely would have been different.  
Strickland v. Washington
, 466 U.S. 668, 694, 80 L. Ed. 2d 674
, 698, 104 S. Ct. 2052, 2068 (1984); 
People v. Albanese
, 104 Ill. 2d 504, 525, 473 N.E.2d 1246, 1255 (1984).

A. Failing to Call Alibi Witnesses

The defendant argues that his trial attorneys were ineffective by failing to call the defendant’s wife and the defendant’s friend, J.R. Valdez, as alibi witnesses.  He asserts that these two witnesses would have testified that he was with them during the time that Novak was beaten.  The defendant contends that his attorneys’ failure to call these witnesses could not be justified as a sound trial strategy in light of the fact that his attorneys presented no defense at trial.

The defendant relies upon 
People v. Gibson
, 244 Ill. App. 3d 700, 703-04, 612 N.E.2d 1372, 1374-75 (1993), for the proposition that failure to call alibi witnesses constitutes ineffectiveness of counsel.  In 
Gibson
, however, the court found that defense counsel may have been ineffective by failing to interview, investigate, or subpoena potential alibi witnesses and remanded the case for a postconviction evidentiary hearing on this issue.

In the present case, the defendant stated in one of his 
pro
 
se
 pleadings that his attorneys interviewed his wife and Valdez as potential alibi witnesses.  The record reflects that the defendant asserted an alibi defense in his response to discovery.  The defendant’s counsel withdrew his alibi defense at a later hearing.  Because the record reflects that the defendant’s attorneys investigated and interviewed the defendant’s potential alibi witnesses, the holding of 
Gibson
 is inapposite.

In 
People v. Williams
, 252 Ill. App. 3d 1050, 1059, 625 N.E.2d 275, 282 (1993), the court ruled that trial counsel was not ineffective for failing to call two alibi witnesses where trial counsel had interviewed the witnesses.  The court in 
Williams
 held that, under such circumstances, the decision to call a potential witness is a matter of trial strategy best left to the attorney.  
Williams
, 252 Ill. App. 3d at 1059, 625 N.E.2d at 282.

Additionally, t
he Illinois Supreme Court has found that a defense attorney properly may choose not to interview or call a witness who could be subject to severe impeachment.  See 
People v. Guest
, 
166 Ill. 2d 381,
 400, 655 N.E.2d 873, 883 
(1995)
.
  A defense attorney may exercise discretion not to call a witness whose testimony may be harmful to the defendant.  See
 
Guest
, 
166 Ill. 2d at 400,
 655 N.E.2d at 882
.  

In the case at bar, according to the complaint for search warrant to search the defendant’s wife’s car, relatives of the defendant told police that his wife helped him clean the blood from her car.  Additionally, the defendant’s wife was given a ride home by police officers during part of the time the defendant would have claimed he was with her and Valdez.  The defendant’s wife could have been severely impeached on at least these two points.  Her testimony, therefore, would have been of questionable value to the defendant and possibly could have been harmful to the defense.

The record does not shed any light on how Valdez might have been impeached.  As noted above, however, the defendant stated that both Valdez and his wife were interviewed by his attorneys.  Under 
Williams
 and 
Guest
, it was a matter of trial strategy that his attorneys chose not to call Valdez and the defendant’s wife as alibi witnesses.  Consequently, we hold that the defendant's attorneys were not ineffective for failing to call the defendant's wife and Valdez as witnesses at trial.

B. Withdrawing the Defendant’s Motion to

Suppress Identification Evidence

The defendant argues that the manner in which the police presented the two photo lineups to Novak was suggestive and that her identification of the defendant’s photo was unreliable.  He contends that the photo arrays were suggestive because (1) the defendant was the only person whose photos appeared in both photo lineups, (2) the defendant’s photo in the second lineup was a clearer image than the other photos in that lineup, and (3) the defendant’s photo in the second lineup was the only one from which the name and date of birth had been omitted.  He also argues that Novak’s identification of the defendant was unreliable because of her level of intoxication during her ordeal.  He submits that his trial attorneys’ decision to withdraw his motion to suppress this identification evidence, therefore, constituted ineffectiveness of counsel.

Although courts disfavor the use of photographs as a basis to identify a suspect in custody when a physical lineup is otherwise feasible, no 
per
 
se
 rule has been established by the court.  
People v. Curtis
, 262 Ill. App. 3d 876, 883, 635 N.E.2d 860, 866 (1994).  The defendant bears the burden of showing that a photographic lineup was unnecessarily suggestive and that the lineup led to a substantial likelihood of misidentification.  
Curtis
, 262 Ill. App. 3d at 883, 635 N.E.2d at 866.

The decision to litigate a motion to suppress evidence is usually a question of trial strategy that has no bearing on the question of attorney competency.  
Williams
, 252 Ill. App. 3d at 1056-57, 625 N.E.2d at 280.  Even if identification of the defendant was obtained in a manner that was unnecessarily suggestive, the test for admissibility of the identification evidence is whether it was sufficiently reliable.  
Williams
, 252 Ill. App. 3d at 1057, 625 N.E.2d at 280.  Reliability of identification evidence is determined by a number of factors, including (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the suspect; (4) the level of certainty demonstrated at the time of the confrontation; (5) the length of time between the crime and the confrontation; and (6) any acquaintance with the suspect prior to the crime.  
Williams
, 252 Ill. App. 3d at 1057, 625 N.E.2d at 280.

In the instant case, identification of the defendant through a physical lineup was not feasible because Novak was hospitalized in the intensive care unit with severe injuries.  The use of photographic lineups was, therefore, justifiable as the only feasible method available to the police for Novak to identify the defendant.

Even if we assume without finding that the photo lineups were presented to Novak in ways that suggested the defendant’s identification, this identification was reliable under the factors listed in 
Williams
.  Novak had the opportunity to view the defendant for a considerable period of time in the bar, in the defendant’s car, and as her beating occurred.  Although Novak had been drinking alcohol, the record indicates that she exercised a high degree of attention to the defendant’s appearance by conversing with him at length about his tattoos.  Novak accurately described to the police the tattoos on the defendant’s neck and arms before identifying the defendant’s photo.  Novak positively identified the defendant as her assailant with great certainty.  She identified the defendant’s photograph within a few days after her beating.  Even if the photo arrays were suggestive, Novak’s identification of the defendant was highly reliable under the factors enumerated in 
Williams
.  Therefore, the defendant has failed to show that his trial attorneys’ performance in withdrawing his motion to suppress prejudiced his case such that the outcome likely would have been different.

C. Failing to Object to Chain of Custody

The defendant contends that his trial attorneys were ineffective by failing to object that chain of custody was not established for the State’s DNA evidence.  The defendant has cited no legal authority for this proposition.  Therefore, the argument is waived.  177 Ill. 2d R. 341(e)(7); 
People v. Felella
, 131 Ill. 2d 525, 540, 546 N.E.2d 492, 498 (1989).

Furthermore, the record reflects that chain of custody was established for the DNA evidence at issue in this case.  At trial, Officer Barry identified the vial of blood drawn from Novak in Barry’s presence and given by Barry to Investigator Robert Persicketti.  Persicketti identified vials of blood drawn from the defendant in Persicketti’s presence.  Persicketti was the officer who gathered and packaged pieces of the defendant’s wife’s car door panel.  He testified in great detail about how the door samples were packaged into bags and the bags were then taped.  He took the blood samples and door panel pieces to the crime lab.

Katherine Davis testified as to the custody of these items of evidence while in the crime lab.  Davis signed these items over to Aaron Small, who signed them over to Julie Glasner for DNA analysis.  It would have been pointless for the defendant’s attorneys to object that chain of custody had not been established in the face of this testimony.

The defendant’s attorneys did not prejudice the defendant’s case by failing to object that chain of custody had not been established for the State’s DNA evidence.  Therefore, we hold that the defendant’s attorneys were not ineffective by failing to object that chain of custody had not been established for the State’s DNA evidence.

II. Whether the Court Erred in Limiting Cross-examination

of the Victim Concerning Her Former Relationship

with a Police Officer

When the issue concerns the admissibility of evidence, the standard of review is whether the trial court's decision amounted to an abuse of discretion.  
People v. Radovick
, 275 Ill. App. 3d 809, 817, 656 N.E.2d 235, 241 
(1995).

Although generally allowed wide latitude in cross-examining the State's witness to show motive to testify falsely, defense counsel may not engage in speculative attacks on such a witness. 

An accused may attempt to prove that someone else committed the crime with which he is charged, but the trial court may reject proffered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty, or its possibly unfair prejudicial nature.  
People v. Allgood
, 242 Ill. App. 3d 1082, 1087, 611 N.E.2d 1127, 1131 (1993).  When proffered evidence that someone other than the defendant committed the crime charged is uncertain or speculative, the trial court, in its discretion, may properly reject it.  
People v. Lewis
, 165 Ill. 2d 305, 342, 651 N.E.2d 72, 89 (1995).

In the case at bar, the defendant’s attorney told the court at sidebar that the defense was investigating the possibility that Novak had been beaten by a policeman with whom she had a relationship.  This information was, at best, uncertain and speculative, and, at worst, unfairly prejudicial in nature.  Defense counsel also submitted that one of the investigating officers overheard someone at the hospital speculate that Novak was attempting to protect the identity of her attacker.  This hearsay information was also uncertain and speculative.  Therefore, we find that the trial judge did not abuse his discretion by rejecting defense counsel’s questioning about this uncertain and speculative subject on grounds of irrelevancy.

III. Whether the State Proved the Elements of Attempted

First Degree Murder Beyond a Reasonable Doubt

The standard to be applied in reviewing the sufficiency of the evidence in a criminal case is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
  
People v. Williams
, 193 Ill. 2d 1, 24, 737 N.E.2d 230, 244 
(2000).

A person commits attempted first degree murder when, with intent to commit that specific offense, the person does an act which constitutes a substantial step toward the commission of first degree murder.  A person commits first degree murder when the person kills an individual without lawful justification and in performing the acts that cause the death, the person intends to kill that individual.  720 ILCS 5/8--4(a), 9--1(a)(1) (West 1996).

Attempted murder is a specific intent crime.  See 
People v.
 
Harris
, 72 Ill. 2d 16, 35, 377 N.E.2d 28, 37 (1978).  Proof of intent
 to kill is necessary for attempted murder.  
People v. Medrano
, 271 Ill. App. 3d 97, 103, 648 N.E.2d 218, 
223 (1995).  Intent to kill is a state of mind which, if not admitted, can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which such an intent may be inferred.  
People v. Mitchell
, 209 Ill. App. 3d 562, 569, 568 N.E.2d 292, 297 
(1991).  Intent to kill may be inferred where one voluntarily commits an act, the natural tendency of which is to destroy another's life.  
Medrano
, 271 Ill. App. 3d at 103-04, 648 N.E.2d at
 224.

Fehil testified that the defendant told Fehil that he wanted to kill the victim and that the defendant thought she was dead after he kicked her in the head.  Additionally, the jury reasonably could have inferred the defendant’s intent to kill from the severity of the beating that placed Novak in the intensive care unit with multiple broken bones, diminished sight in her left eye, and a metal plate in her head. 

Therefore, taking the evidence in the light most favorable to the prosecution, we hold that the State did not fail to prove the elements of attempted first degree murder beyond a reasonable doubt.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the Will County circuit court.

Affirmed.

HOLDRIDGE and SLATER, JJ., concurred.