2022 IL App (2d) 210406-U
No. 2-21-0406
Order filed October 17, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08-CF-32 |
| DeMICHAEL FOAT, | ) ) | Honorable Ronald J. White, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*:  Defendant failed to make a substantial showing that his trial counsel was ineffective for neglecting to call two witnesses who defendant claimed would substantiate his defense to first-degree murder.  First, trial counsel could reasonably conclude that the witnesses might harm the defense given that one witness was vulnerable to substantial impeachment and the other would give testimony inconsistent with defendant's on the issue of whether the shooting was justified.  Second, there was no prejudice to defendant from counsel's conduct given the substantial evidence of guilt.

¶ 2   Defendant, DeMichael Foat, appeals from the second-stage dismissal of his petition under

the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)).  He contends that

he made a substantial showing that his trial counsel was ineffective for failing to call certain

witnesses at his first-degree murder trial. Because counsel was not deficient in failing to call the witnesses and defendant was not prejudiced by counsel's failure, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State indicted defendant on six counts of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2008)) arising out of the shooting death of Jermaine Malone (Malone).

¶ 5      The following facts were presented at defendant's jury trial. On January 1, 2008, at about 4:20 a.m., a red Pontiac was driving north on Central Avenue in Rockford when it slid on the icy road, entered the oncoming lane, and struck a southbound white Chevrolet. There was significant front-end damage to both vehicles.

¶ 6      Lekeisha Hill was driving the Pontiac. Malone, Hill's boyfriend and the father of her two children, was the front-seat passenger. Terricka N. Purifoy (Terricka) (to be distinguished from Terrica C. Purifoy, *infra ¶* 14) was in the rear seat. Hill admitted that she had been drinking earlier both at a club and in the Pontiac and that there were bottles of Grey Goose and Remy in the car. After the accident, she threw the bottles into a nearby field to avoid being arrested for driving under the influence.

¶ 7      Jermaine Foat (Jermaine), defendant's cousin, was driving the Chevrolet. In the front passenger seat was defendant's brother, DeAngelo Matlouck, who was partially paralyzed from a prior incident. Raven Cherry was the rear-seat passenger.

¶ 8      A black van, driven by Lewis Darby, followed the Chevrolet. Also in the van were defendant and several companions, including Derrick Neville. After the accident, the van stopped.

¶ 9      Defendant exited the van to check on Matlouck in the Chevrolet. According to defendant, Matlouck was seriously injured but alive. Matlouck testified that he lost consciousness shortly

after the crash. One witness heard defendant saying things that suggested he thought Matlouck was dead. Several other men exited the van and placed Matlouck into the van.

¶ 10 Hill backed her car into the northbound lane after the accident, upon which someone approached, took the keys out of the ignition, and said, " '[Y]ou're not going nowhere.' "

¶ 11 Malone exited the Pontiac to see if everyone was okay. He then walked over to the Chevrolet to see if its occupants were okay. When he did so, defendant and several of his companions approached Malone. Neither Hill nor Terricka saw anything in Malone's hands. Defendant approached Malone as Malone stood near the rear passenger side of the Pontiac. According to Hill, who was four or five steps away, defendant pulled out a gun. Defendant was within arm's reach of Malone and pointed the gun close to his head. Defendant shot Malone one time. Malone jerked and fell to the ground. Hill screamed and laid on top of Malone. She then called 911.

¶ 12 On cross-examination, Hill denied telling a police detective that she heard a "pop" but did not see a gun. She acknowledged that, in photo arrays, she was able to identify who took her car keys but was unable to identify the shooter.

¶ 13 On redirect examination, Hill testified that Malone was not drunk at the time of the accident and had not been drinking in the car. Malone was not fighting with anyone before being shot and did not have a weapon in his hands. Hill was "[o]ne hundred percent" certain that defendant shot Malone.

¶ 14 Terricka testified that she exited the Pontiac after the accident. Defendant was waving a gun and yelling, " 'What the F is wrong with my brother?' " She then flagged down a car driven by her cousin, Terrica C. Purifoy (Terrica), so that she could use her cell phone to call her mother. While sitting in her cousin's car talking to her mother on the phone, Terricka looked back and saw

someone raise a gun from their side and point it at Malone. The shooter was about two inches from Malone. She yelled, " '[N]o, don't do that.' " She then saw fire come from the gun. Malone did not have a gun or anything else in his hands. She identified defendant in court as the shooter. Although there were several people around Malone, no one was between defendant and Malone at the time of the shooting.

¶ 15    On cross-examination, Terricka admitted that she drank before the incident and that there was a bottle of Grey Goose in Hill's car. She also admitted that she did not testify before the grand jury that she saw who shot Malone. Specifically, she was asked at the grand jury proceeding if she saw what happened to Malone and she answered, " '[N]o, I just looked back and he was on the ground.' " She maintained at trial that she did indeed see who shot Malone, and she explained that she was "probably was confused" when she gave a different account to the grand jury. She also admitted that, in a statement to the police, she reported that she observed a black male with a gun but did not identify him as defendant.

¶ 16    Terrica was driving on Central Avenue when she encountered the traffic accident. There was a red car, a white car, a black van, and 10 to 12 people standing around. She stopped because she recognized Terricka, who asked to use her cell phone. As she sat in her car, she heard a single shot and saw a flash. She did not see the person who fired the shot.

¶ 17    Cherry testified that, after the crash, everyone exited the Chevrolet except Matlouck. She saw several people from the black van remove Matlouck and put him in the van. As Cherry stood near the Chevrolet, she heard people arguing, then heard a shot. She did not see where the shot came from. After the shot, defendant and Darby entered the van and left.

¶ 18    Dontrell Bennett and Steve Owens were passengers in the black van that was following the Chevrolet. After the accident, Bennett heard one shot fired near the Pontiac. He denied seeing

defendant with a gun. He claimed that he did not recall testifying before the grand jury that he saw defendant with a handgun at a party before the shooting and that he observed defendant put the gun in his pants after the shooting.

¶ 19     Owens testified that, after the accident, everyone but him exited the van. At one point, he saw Malone, whom he knew from grade school, go over to the Chevrolet and ask if everyone was okay. According to Owens, Malone was drinking from a bottle of Hennessey in his hand but was not arguing with anyone. Owens testified that defendant, who thought Matlouck was dead, went over and held a gun to Malone's head. Owens thought that defendant was "drunk, off pills, and everything else" and was trying to scare Malone. Defendant was waving the gun when it suddenly went off and Malone was "gone." Owens further testified that defendant raised the gun with his right hand. The gun "was shaking *** and it went off." Defendant did not say anything before shooting Malone. Defendant was one foot from Malone when he shot. Malone had no gun. After shooting Malone, defendant looked at Malone for a second and then walked to the van. At that point, Owens and several others, including defendant, left in the van to take Matlouck to the hospital. On the way there, Darby stopped the van and defendant jumped out and ran off.

¶ 20     Owens acknowledged that the police showed him a photo lineup, in which he identified defendant as the one who shot Malone.

¶ 21     On cross-examination, Owens admitted that, when he first spoke to Rockford police detective Eric Harris, he said that he did not see who shot Malone. The second time he talked to Detective Harris, he fabricated a story about an ambush and someone jumping out and shooting Malone.

¶ 22     On redirect examination, Owens testified that Malone was not arguing with anyone before the shooting but was telling defendant to leave him alone because he was just trying to check if

everyone was okay. According to Owens, defendant put the gun to Malone's head and Malone slapped it away. Defendant then "turned [Malone] around" and slapped Malone on the side of his face with the gun. Malone stood there, looked at defendant, and did not say anything. Defendant then shot him. Defendant fired one shot and retained the gun.

¶ 23 Owens testified that the "third time" he was interviewed by the police, he told them that defendant shot Malone. He explained that, because of "everything [that] was going through [his] head," he did not initially tell the police that defendant was the shooter.

¶ 24 Dr. Larry Blum reviewed the report of the autopsy performed on Malone. Based on the wound and powder marks on the skin around the entry hole, Dr. Blum opined that the gun was from ½ inch to 2 inches away when fired. It was not a contact wound; the muzzle was not touching the skin when the gun discharged. The path of the bullet was front to back, right to left, and downward. A blood alcohol test revealed no alcohol or illegal drugs in Malone's system.

¶ 25 Detective Harris testified that, on January 2, 2008, an arrest warrant was issued for defendant. In April 2008, the police located defendant in someone's home. When defendant was found in the basement on a bed, he said, "[W]hat took you so long[?]"

¶ 26 Rockford detective Daniel Scharlau testified for the defense that Hill told him at the scene that she heard a "pop" but did not initially say that she saw a gun. She did also tell him, however, that the person who shot Malone was the same person who told the occupants of the Pontiac that " 'nobody is going nowhere.' " However, Detective Sharlau admitted that he wrote in his notes that Hill " 'didn't see who shot.' "

¶ 27 Defendant testified that he had a gun the night of the incident because he had seen someone display a gun earlier at a party. After the accident, defendant approached the Chevrolet to check on Matlouck. Matlouck was bleeding from the mouth, but defendant did not think he was dead.

When the Pontiac backed up, defendant and Jermaine told the occupants that they would not be going anywhere. When Jermaine approached the Pontiac, Malone got out. Jermaine asked Malone what happened, and Malone told him to ask Hill. Jermaine then removed the keys from the Pontiac. Jermaine said to Malone, " 'I should knock you out.' " Jermaine then turned his back to defendant. Defendant saw that Malone had a bottle of Remy in his hand but did not know if Malone was drinking from it. As Jermaine walked away, defendant saw Malone raise the bottle like he was going to hit Jermaine. Defendant then "pulled [his] gun and smacked [Malone]." Defendant denied waving the gun around before striking Malone. According to defendant, when he struck Malone with the gun, it discharged. He denied that he intended to shoot Malone. Rather, he "smacked" Malone to protect Jermaine.

¶ 28 After the gun went off and Malone fell to the ground, defendant looked at him but did not think that he shot him. He did not see any blood and assumed that the blow alone caused Malone to fall. He was surprised when he learned later that morning that Malone had died.

¶ 29 On cross-examination, defendant admitted that he kept the gun in the front pocket of his hoodie and that it was loaded that night. He struck Malone on the right side of the head while his finger was on the trigger. He admitted that he lied to the police when he told them that he did not have a gun on the night of the incident and that someone else shot Malone. Defendant denied that he aimed the gun at Malone or that he was angry. He claimed that he accidently shot Malone.

¶ 30 The trial court instructed the jury on first-degree murder, second-degree murder, involuntary manslaughter, and defense of another. The jury found that defendant fired the gun that killed Malone and also found him guilty of first-degree murder.

¶ 31 Defendant filed a motion for a new trial, which he twice amended. In the second amended motion, trial counsel alleged that he denied defendant the effective assistance of counsel by failing

to call certain witnesses. At a hearing on that motion, defendant told the court that counsel should have called Dwarn Bennett, Martell Williams, and Quamane Simmons, all of whom were in the black van and witnessed the incident. After counsel explained why he did not call those witnesses, he volunteered that, as a matter of trial strategy, he did not call Neville because his testimony would have been inconsistent with defendant's testimony. Counsel explained that, based on his witness statement, Neville would have testified that Malone was going to hit defendant and not Jermaine with a bottle. Neville also had "heavy impeachables" in the form of felony convictions. The court found that there was no neglect by trial counsel that would require appointment of new counsel to investigate defendant's ineffectiveness claim.

¶ 32     The trial court sentenced defendant to 75 years' imprisonment, which included a 25-year enhancement based on defendant's use of a firearm.

¶ 33     On appeal, defendant claimed only that his sentence was excessive. We affirmed. *People v. Foat*, 2011 IL App (2d) 100129-U.

¶ 34     In February 2012, defendant filed a *pro se* postconviction petition under the Act. In August 2019, he was allowed to amend the *pro se* petition.

¶ 35     In his amended petition, defendant claimed, among other things, that his trial counsel was ineffective for failing to call Neville and Darby as witnesses to corroborate his version of events. Defendant asserted that, had the jury heard their testimony, there was a "great possibility" that he would have been found not guilty of first-degree murder or guilty of a lesser offense.

¶ 36     Defendant attached an affidavit obtained from Neville in 2016. In his affidavit, Neville averred that Jermaine took the keys out of Hill's car when it looked like she was going to leave the scene. Malone then exited the car while holding a bottle of alcohol and told Jermaine to give the keys to Hill. Jermaine replied that no one was going anywhere and turned to walk away.

Neville was a few feet away when he saw Malone raise the bottle and take several quick steps toward Jermaine. Defendant then took a gun from his pants and struck Malone on the side of the head with the gun, which discharged in the process. Defendant was holding the gun in the palm of his hand and did not point the gun at Malone. Neville thought that Malone had been knocked out and not shot. Neville further averred that he shared this account with trial counsel before trial. He told counsel that he wanted to testify that defendant did not intend to shoot Malone and that Malone was going to hit Jermaine in the back of the head with the bottle. According to Neville, trial counsel told him that his testimony would not be helpful because it was the same testimony defendant planned to give.

¶ 37 Darby's affidavit was not attached to the amended postconviction petition but appears elsewhere in the record. The affidavit was dated February 16, 2021. Defendant read the affidavit into the record at a prehearing proceeding. Darby averred that he saw Jermaine take the keys from the Pontiac and start to walk away. "The guy" (Malone) walked up and "grabbed" Jermaine. Defendant then pulled a gun, swung it at Malone, and the gun fired. Darby did not hear defendant shout or see him point the gun at Malone. Darby stated that he had given the same testimony to the grand jury and was willing to give it again at trial. The affidavit was signed and dated February 16, 2021.

¶ 38 At the hearing on the State's motion to dismiss the petition, defendant asserted that, although Neville was brought to court, trial counsel opted not to call him. According to defendant, counsel told him that he decided not to call Neville, because (1) his testimony would have been the same as defendant's and (2) Neville had pending charges. Defendant pointed out that, at the hearing on the motion for a new trial, counsel told the court that he did not call Neville because his testimony would have been inconsistent with defendant's.

¶ 39    Defendant further stated that he told trial counsel that he wanted to call Darby as a witness, but counsel said that discovery showed that Darby would testify that defendant killed Malone. According to defendant, it was not until 2019, when he reviewed the grand jury transcript and other written statements, that he learned that Darby's account was not as counsel described.

¶ 40    The trial court granted the State's motion to dismiss. In doing so, the court found that trial counsel's failure to call either Neville or Darby was a matter of trial strategy. Defendant, in turn, filed this timely appeal.

¶ 41                                II. ANALYSIS

¶ 42    On appeal, defendant contends that he made a substantial showing that trial counsel was ineffective for failing to call Neville and Darby as witnesses, as they would have corroborated his defense to first-degree murder.

¶ 43    The Act allows a defendant to challenge a conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). In noncapital cases, postconviction proceedings contain three stages. *People v. Domagala*, 2013 IL 113688, ¶ 32. Relevant here, at the second stage of review, the defendant bears the burden of making a " 'substantial showing of a constitutional violation.' " *Domagala*, 2013 IL 113688, ¶ 33 (quoting *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)). The second stage tests the legal sufficiency of the petition: unless the allegations are positively rebutted by the record, they are taken as true, and the question to be resolved is whether those allegations establish a constitutional violation. *Domagala*, 2013 IL 113688, ¶ 35. Put another way, the "substantial showing" of a constitutional violation at the second stage is a measure of the legal sufficiency of the defendant's well-pled allegations of a constitutional violation, which, if proven at an evidentiary hearing, would entitle

the defendant to relief. *Domagala*, 2013 IL 113688, ¶ 35. We review *de novo* the trial court's second-stage dismissal. *Pendleton*, 223 Ill. 2d at 473.

¶ 44 Claims of ineffective assistance of counsel are governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). To establish ineffective assistance, a defendant must show both that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant. *Petrenko*, 237 Ill. 2d at 496. Deficient performance is that which is objectively unreasonable under prevailing professional norms, and prejudice is found where there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Petrenko*, 237 Ill. 2d at 496-97. The failure to establish either prong is fatal to the claim. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010).

¶ 45 Matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *People v. West*, 187 Ill. 2d 418, 432-33 (1999). Indeed, even a mistake in trial strategy will not alone render representation constitutionally defective unless counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case. *People v. Peterson*, 2017 IL 120331, ¶ 80. Thus, we must be highly deferential to decisions of trial strategy and evaluate counsel's performance from his perspective at the time and not as a matter of hindsight. *People v. Stewart*, 104 Ill. 2d 463, 491-92 (1984). A defendant bears the burden of overcoming the presumption that his counsel's decision was the product of a sound trial strategy. *People v. Gacy*, 125 Ill. 2d 117, 126 (1988).

¶ 46 The decision of whether to call a certain witness for the defense is a matter of trial strategy, left to the discretion of counsel after consultation with the defendant, and such decisions will not ordinarily support a claim of ineffective assistance of counsel. *Peterson*, 2017 IL 120331, ¶ 80.

The failure to call a witness will not support an ineffectiveness claim where it was reasonable for counsel to believe that the anticipated testimony would have no probative value to guilt or innocence (*People v. Ashford*, 121 Ill. 2d 55, 74-75 (1988)), would be unreliable, or would likely harm the defendant's case (*People v. Flores,* 128 Ill. 2d 66, 106 (1989)). Further, a defense attorney may choose not to call a witness who could be subject to severe impeachment. See *People v. Smado*, 322 Ill. App. 3d 329, 335 (2001).

¶ 47    We first address whether defendant made a substantial showing that trial counsel was deficient for failing to call either Darby or Neville as a witness. In doing so, we note that we accept as true all well-pled facts in the petition and affidavits. Our task is to determine whether, based on those facts, defendant's claim is legally sufficient.

¶ 48    We begin by reiterating that the decision to call a particular witness is a matter of trial strategy that will not support a claim of ineffectiveness unless it resulted in an entire lack of meaningful adversarial testing of the State's case. We hold that trial counsel's decision not to call either Darby or Neville did not result in a lack of meaningful adversarial testing.

¶ 49    At the hearing on defendant's posttrial motion, counsel explained that he opted not to call Neville because (1) the account he gave in his witness statement was slightly inconsistent with defendant's version, in that Neville would testify that Malone was attempting to hit defendant (not Jermaine) with the bottle; and (2) Neville had felony convictions that would have subjected him to heavy impeachment. However, in his affidavit, Neville stated that he told counsel before trial that Malone attempted to strike Jermaine (not defendant) with the bottle. Assuming, as we must, that Neville's version in his affidavit was true, counsel was aware that Neville was prepared to testify, consistent with defendant's account, that Malone attempted to hit Jermaine with the bottle. However, counsel was also aware that Neville had provided a contrary version in his witness

statement. Accordingly, counsel knew that Neville would be subject to cross-examination about his prior inconsistent statement. Thus, had counsel called him as a witness, Neville would have potentially harmed defendant's case when the jury heard about Neville's prior inconsistent version of events.

¶ 50 Additionally, Neville had a prior felony conviction for a drug offense, which would have subjected him to impeachment, whether it was brought up via direct or cross-examination. Although counsel's statement that Neville had "heavy impeachables" may have been overblown, Neville's credibility as a witness was certainly subject to an attack that would have lessened any positive impact of his potential testimony.

¶ 51 Based on the reasonable concern that Neville would be impeached by his prior felony conviction and cross-examined about his prior inconsistent statement, counsel was entirely reasonable in deciding not to call Neville as a witness. More importantly, his failure to do so does not show a lack of meaningful adversarial testing.

¶ 52 As for Darby, he averred in his affidavit that he saw Malone walk up and "grab[ ]" Jermaine. Defendant then pulled a gun, swung it at Malone, and the gun fired. Darby did not see defendant point the gun at Malone. According to Darby, he testified before the grand jury consistent with his affidavit.

¶ 53 Counsel was not unreasonable in not calling Darby as a witness. While defendant testified that he intervened when Malone was about to hit Jermaine with a bottle, Darby's affidavit never mentioned his seeing Malone attempt to swing a bottle at Jermaine. Instead, he saw Malone merely "grab[ ]" Jermaine. Absent the presence of a deadly weapon or some other indication that Malone was threatening the imminent use of deadly force upon Jermaine, simply grabbing Jermaine would not have justified defendant's use of deadly force, *i.e.*, either shooting Malone or striking him in

the head with the gun. Thus, if Darby testified consistently with his affidavit, the jury would have had to reconcile his testimony with defendant's on the crucial issue of whether Malone threatened deadly force. Because Darby's testimony would not have helped—and indeed might have affirmatively harmed—defendant on the issue of whether the use of deadly force was justified, counsel was not unreasonable in failing to call Darby.

¶ 54    Therefore, the trial court properly dismissed the postconviction petition on the basis that trial counsel was not deficient in failing to call either Neville or Darby as a witness.

¶ 55    Further, even if trial counsel were deficient in failing to call Neville or Darby, that deficiency was not prejudicial, as it is not reasonably probable that the outcome of the trial would have been different if counsel had called those witnesses. There was substantial evidence to support the jury's verdict. In discussing that evidence, we emphasize that much of the trial testimony focused on whether defendant was the shooter. However, defendant testified that, although he did not intentionally shoot Malone, he struck Malone in the side of the head with the gun and it discharged in the process. Thus, the primary factual dispute, in light of defendant's testimony, was whether defendant aimed the gun and shot Malone or whether the gun went off accidentally when defendant hit Malone with the gun.

¶ 56    To that end, there were three witnesses—Hill, Terricka, and Owens—who testified that they saw defendant point the gun at and shoot Malone. According to Hill, she was only a few feet away when she saw defendant pull out a gun, aim it at Malone—who was not armed or acting aggressively—and shoot him. Defendant was within arm's reach of Malone when he shot him. Although Hill was subject to cross-examination about her prior drinking and some inconsistencies in her story, it was the jury's province to assess her credibility and her opportunity to observe the events. Terricka testified that she saw defendant waving a gun. As she sat in her cousin's car, she

saw defendant, who was two inches from Malone, raise the gun and shoot Malone. She admitted on cross-examination that she (1) drank before the incident, (2) had testified before the grand jury that she did not see who shot Malone, and (3) did not identify defendant as the shooter in her statement to the police. Nonetheless, it was for the jury to assess her credibility. Owens, who was a passenger with defendant in the black van, testified that he saw defendant point the gun at Malone's head to scare him. According to Owens, defendant raised the gun and, as it was shaking, it discharged. Defendant was about a foot away. Malone was not armed. The testimony of Hill, Terricka, and Owens was consistent in describing defendant as standing close to Malone as he aimed the gun at Malone and fired.

¶ 57     Additionally, Dr. Blum testified that the gunshot wound to Malone's head showed that the gun's muzzle was ½ inch to 2 inches from Malone's skin when the gun was fired. Further, the bullet struck Malone in the right side of his forehead, then traveled on a downward angle from right to left and from front to back through Malone's brain. The bullet's trajectory was not consistent with defendant's testimony—or the potential testimony of Neville and Darby—that defendant slapped Malone with the gun in his palm and it discharged. As Dr. Blum testified, the forensic evidence supported that defendant held the weapon and fired it at Malone's head, which was consistent with the State's witnesses who testified that defendant pointed the gun at and shot Malone at close range.

¶ 58     Further, on January 2, 2008, an arrest warrant was issued for defendant, but he was not taken into custody until April of 2008. Thus, he eluded capture for nearly three months. This showed consciousness of guilt and, thus, was additional evidence from which the jury could infer that defendant had committed the crime as charged. See *People Williams*, 266 Ill. App. 3d 752, 760 (1994); *People v. Moore*, 98 Ill. App. 3d 507, 512-13 (1981).

¶ 59    In sum, there was substantial evidence that Malone was not armed or the aggressor yet defendant pointed the gun at Malone and intentionally shot him in the head. Thus, it was not reasonably probable that Neville's and Darby's testimony would have resulted in a different verdict on the first-degree murder charge. Accordingly, defendant failed to make a substantial showing that he suffered prejudice from counsel's allegedly deficient performance. The lack of prejudice was sufficient by itself to justify the dismissal of the petition.

¶ 60                                   III. CONCLUSION

¶ 61    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 62    Affirmed.